**William L. SPARKS, Appellant,**

v.

**Dorothy DOE, Appellee.**

**LIBERTY MUTUAL INSURANCE COMPANY, Appellant,**

v.

**Dorothy DOE, Appellee.**

Court of Appeals of Kentucky.

Feb. 28, 1964.

Rehearing Denied June 19, 1964.

Julius Leibson, David Gittleman, Louisville, for William L. Sparks.

Ben Matthews, Bernard B. Davis, Shelbyville, for Dorothy Doe.

Gavin H. Cochran, Marshall Cochran, Heyburn & Wells, Mark Davis, Jr., Louisville, for Liberty Mut. Ins. Co.

PALMORE, Judge.

Two trucks going in opposite directions on U. S. 60 between Simpsonville and Shelbyville had a head-on collision caused by the presence in the road of a cow owned jointly by the appellee, Dorothy Doe, and her share tenant, John Watson. William Sparks, driver of the east-bound truck (a tractor-trailer unit), sustained personal injuries for which he sued Mrs. Doe. He appeals from a judgment entered pursuant to a jury verdict in her favor.

The accident occurred early in the morning while it was still dark. The place was in front of Mrs. Doe's farm, which bordered the highway on the south and was enclosed by a fence situated 30 to 40 feet from the edge of the pavement. At a distance of some 400 feet from the point of impact Sparks topped a hill and observed the lights of the vehicle approaching from the east, and he dimmed his headlights. When he came within about 100 feet of the point of impact he noticed 100 to 150 feet ahead of him four or five cattle walking parallel with the road about half way between the pavement and Mrs. Doe's fence. He was traveling, he said, at a rate of 38 to 40 m. p. h. and did not think it necessary to slacken his speed because if any of the cattle had started toward the road he would have passed before they got to it. Suddenly, however, another cow, previously unobserved, appeared from the left and stepped into his traffic lane 15 or 20 feet in front of his truck. The left front corner

of the Sparks truck hit the cow, causing the trailer to jack-knife and turn over crosswise of the highway, whereupon it was immediately struck by the oncoming vehicle from the east.[1]

Of principal concern in this case are the meaning and significance of KRS 259.-210(1) and (2), which provide in part as follows:

"(1) No person shall permit any cattle owned by him or under his control or in his custody, to run at large.

"(2) If any damage is committed by cattle permitted to run at large, the owner of the cattle shall be liable for all damages," etc.

In Wigginton & Sweeney v. Bruce's Guardian, 174 Ky. 691, 192 S.W. 850 (1917), the word "permit" in this statute was construed as including a failure to exercise "that degree of care that is usually exercised by ordinarily prudent persons under the same circumstances." It was later held in Ellington v. Strader, Ky., 285 S.W.2d 497 (1955), that the unexplained presence of a cow on a highway creates against the owner a rebuttable presumption of negligence, entitling the injured plaintiff to a directed verdict unless the owner comes forward with rebutting evidence on that issue.[2] In the latter case the defendant did not put on any evidence at all (in fact, the trial court had erroneously directed a verdict in his favor), and in the course of its opinion this court observed "that it would not be unreasonable to require the owner of the cow, who had peculiar means of access to the facts as to how the cow got out, to make those facts known to the court." On the strength of this passing comment appellant contends in this case that because Mrs. Doe was unable to show how her cow or cows got out he was entitled

1. The term "point of impact" as used here means the point where Sparks hit the cow.

2. See discussions in Lee v. Tucker, Ky., 365 S.W.2d 849 (1963), and Bell & Koch, Inc., v. Stanley, Ky., 375 S.W.2d 696 (1964).

to a directed verdict against her. We do not agree.

There was ample evidence from which the jury could have found that Mrs. Doe's fence was in a state of disrepair and had at least one hole through which it was possible for stock to escape. On the other hand, there was evidence in her behalf to the effect that the fence was adequate and in good order and that all the gates had been closed the night before and were still closed immediately after the accident. Neither Watson nor Mrs. Doe was able to say how the cattle had escaped. There were, however, other people living on the farm and there had been instances in the past when a person or persons unknown had left a gate open.

The question is, was there enough evidence of the exercise of ordinary care by Mrs. Doe, in rebuttal of the presumption of negligence arising from the presence of her cow in the road, so that it could no longer be said that there was but one conclusion to be drawn by reasonable men? Cf. Lee v. Tucker, Ky., 365 S.W.2d 849, 851 (1963). If not, then in effect we make the farmer an insurer, and we prefer to leave that to the legislature.

■ Mrs. Doe's evidence authorized the jury to believe (albeit over conflicting testimony) that she had a good fence and that her tenant had closed and chained all the gates before retiring the night before. Perhaps farmers situated on or near main highways ought to lock their gates, but we know they customarily do not, and in the context of the common law what is custom is not negligence. Only direct legislation could properly make it so.

In some cases the farmer may know and be able to say how his stock got out, but in many cases he cannot. Hunters, fishermen, surveyors, neighbors and numerous others will presume on his good nature and enter his property without permission. Gates will be left open from time to time without his knowledge and without negligence on his part. We cannot hang him

on that account. If the owner of a straying cow chooses to stand mute, certainly a verdict should be directed against him. But this is all that was meant by the cited comment in the Ellington case; it did not imply that the owner must always be convicted of negligence unless he succeeds in showing just how the escape occurred.

■ We hold that Mrs. Doe produced sufficient evidence of the exercise of ordinary care to create a jury question.

The instruction covering negligence by Mrs. Doe was to the effect that it was her duty "not to permit any cattle owned by her, or under her control, or in her custody, to run at large," and that if she "did negligently permit any such cattle * * * to run at large, and * * * as a direct and consequent result of her so doing the accident was caused to occur" the law was for the plaintiff. This was a correct statement of KRS 259.210(1) and (2) as construed in Wigginton & Sweeney v. Bruce's Guardian, 174 Ky. 691, 192 S.W. 850 (1917). It was not necessary for the statutory provisions to be set out in haec verba as submitted in instructions (1) and (2) offered by Sparks.

■ Instruction (3) tendered by Sparks and rejected by the court stated that the law was for the plaintiff unless the jury believed from the evidence "all of the following:

"(a) That the defendant exercised due care to restrain the cattle; and

"(b) That it was at large without any fault of the defendant; and

"(c) That the defendant promptly pursued it; in which event you shall find for the defendant."

Subsection (a) of this tender was fairly embodied in the instruction given by the court. So was subsection (b) unless the expression "any fault" be taken to connote a higher standard than ordinary care, in which event it would be improper. Ordinary care being the standard to which those

who use the highways are held, we see no justice in applying a stricter one to those who live by the side of the road.

Subsection (c) of the offered instruction (3) was *tantamount to a directed verdict* for the plaintiff and would have been manifestly improper.

■ The only other instructions offered by Sparks dealt with damages and the number of jurors required to agree on a verdict. It will be noted that the possible agency or master-servant relationship between Watson and Mrs. Doe was not covered. Nor was it mentioned in the course of the arguments on the instructions. It is obvious from the transcript that Sparks's objection to the instructions on this ground was dictated after the case had been argued and submitted to the jury. The pertinent passage in the transcript reads as follows:

"Comes the plaintiff and objects to instruction number one given by the court because: (1) it fails to tell the jury that the negligence, if any, of the defendant's agents, servants and employees acting on her business, was imputable to her, even though the Court *during closing argument by Mr. Davis* told the Jury from the Bench that that was what he meant by the instruction." (Emphasis added.)

We cannot consider an afterthought objection to the instructions as timely made; and in the absence of a waiver by counsel the trial court had no right to defer the raising of objections until after the jury had retired to deliberate under the guidance of instructions already given. The object of CR 51 is to smoke out all impurities beforehand, to the end that the jury will be properly instructed and the case tried but once. Had counsel for Sparks made the point at the proper time, counsel for Mrs. Doe may very well have conceded it rather than court the risk of a reversible error, and at least the trial court would have had a timely opportunity to consider it.

We have the same opinion with regard to the objection to the closing argument by counsel for Mrs. Doe, in which he insisted, over objections, that "you will search in vain to find anything that tells you if you believe that John Watson was negligent to find against Dorothy Doe, you won't find that in here," etc. In the ensuing colloquy among court and counsel in the hearing of the jury the following was said:

BY MR. LEIBSON: "The negligence of Mr. Watson, if any, is just as much her negligence as his, if Your Honor, please, and we allege in our complaint that she was negligent through the agency—through her agents, servants and employees, and that's what is meant by that instruction.

BY THE COURT: "That's what I intended to mean by that instruction.

BY MR. DAVIS: "Well, we will submit these instructions to you.

BY MR. LEIBSON: "Well, the Court just said he meant—

BY MR. DAVIS: "Well, now, if the Court is going to amend the instructions I would like to be heard out of the presence of the Jury and have the instructions amended in writing or if we are going to abide by the—

BY MR. LEIBSON: "The Court said—

BY MR. DAVIS: "Well, wait a minute, Mr. Leibson. Or have the Court permit me to argue the instructions as they are written.

BY MR. LEIBSON: "The Court means just what he said there and he said that's just what he meant by it, just what he said.

BY MR. DAVIS: "All right—

BY THE COURT: "The Jury heard it."

And so on.

In spite of the suggestion that the matter be discussed in chambers with a view to amending the instructions counsel for Sparks did not move the court to do so, and in his closing speech to the jury was permitted without objection to comment as follows:

"Now, let me get down to a very serious case. You've got a simple case to try. The law says, and His Honor so told you, that Mrs. Doe shall not permit any cattle to get out on that highway and cause injury to anybody else. I want to tell you one thing. Now, in his zealousness I saw something happen here a while ago, and I've been trying cases for thirty-three years, and I have tried them pretty much all over, not only in Kentucky but elsewhere, I have not before seen such a situation where the Judge, who is the Judge of the case, and, who when he tells you what the law is, by your oath you must follow it, tells you from that Bench that he meant what he said about Mrs. Doe being negligent, he meant by that through herself or through her agents or employees, a lawyer stand up and still argue the contrary. That I have never seen before, and never expect again to see. Now, you heard His Honor tell you that he meant by that instruction that if you believe that the negligence of Mrs. Doe, or her agent, or servant or employee acting for her, that is the same as her own negligence, and, yet, Mr. Bernard Davis, as good a lawyer as he is, and as nice a guy as he is, had the nerve to tell you, in the presence of His Honor, to disregard what His Honor told you from the Bench. Now, let's get that out of the way * * *. The law requires Mrs. Doe, herself, and through her agents, those in charge of her farm, to exercise ordinary care, to not be negligent in the maintenance of their fence, in order to see to it that their cows do not do what this cow on that occasion did."

■ Whatever confusion existed regarding the agency relationship was made possible by the failure of counsel for Sparks to request an appropriate instruction in the first place and by his subsequent election to stand on the court's remark, "That's what I intended to mean by that instruction," instead of acceding to the suggestion that the question of whether the instructions meant more than they said be taken up in chambers and that they be amended if necessary. Had the court given the very instructions offered in behalf of Sparks, the situation in this respect would have been precisely the same. Under the circumstances, we cannot say that the argument of counsel was improper or prejudicial. A lawyer defending his client is not engaged in philanthropy.

Objection was raised against other isolated remarks made in the summation for Mrs. Doe in which, for example, it was said, "You are a farmer, many of you, and the only way you can project yourself into her position is *to think of your wife running a farm under these circumstances,*" and "that it is unreasonable and unrealistic to come before you and ask that she be held liable in damage for Sixty-five Thousand Five Hundred Dollars, *that her farm be stripped from her,* because this man came down that road and hit that cow under those circumstances, through no fault of hers, when he had every opportunity to avoid the collision," etc. (Emphasis added.)

Responding to the latter suggestion, when it came his turn counsel for Sparks proved equal to the occasion: "And let me tell you this, let me urge you *not to trouble yourselves at all about how this will affect Mrs. Doe.* * * * So, here is a man who has got these terrible and lasting injuries, and Mr. Davis tells you 'that the nerve of this Bill Sparks to ask you to strip her of her farm.' *You can bet your last penny that it will not do any such thing to this lady.*" (Emphasis added.) Though invited by the previous remarks of counsel for Mrs. Doe, these shafts more nearly approached the proscription of Randle v. Mitchell, 283 Ky. 501, 142 S.W.2d 124 (1940) than did the references made in behalf of Mrs. Doe.

■ We realize, of course, that allusions to a litigant's situation as a widow whose

property may be taken from her tend to create sympathy in her behalf and may be carried so far that the likelihood of prejudice is too great to let it pass. But each case must be judged by its individual circumstances. Counsel must be allowed a reasonable latitude in arguing his case, and jurors are not to be regarded as complete dupes. If we should hold these particular remarks prejudicial many a wrathful plaintiff's counsel would find himself in the same predicament. After perusing the closing address by counsel for Sparks (in which, for example, he was pictured as "a high class boy trying to support his family") we are constrained to say that he had much the better of it on this score.

We are not persuaded that Sparks was unfairly prejudiced by the argument.

■ The final questions are whether the trial court erred in giving an instruction on contributory negligence and, if not, in enumerating among Sparks's duties the statutory requirements as to speed (40 m. p. h.) [3] and headlights.[4]

It will be recalled that as he approached about 100 feet from the ultimate point at which he struck the cow coming from his left Sparks saw four or five cows walking along the side of the road to his right. He testified that they were "plainly visible," but he did not sooner discover the one on his left "because of the other cattle I was watching there at the edge of the road of my lane. If I looked over to the left into those oncoming lights it probably would have blinded me and I wouldn't have been able to see anything." He did not slacken his speed, because he felt that he could clear those cows on the right before any of them could get in his way.

Putting ourselves in the position of jurors, we probably would not find Sparks to have been negligent. But we cannot say there is no room on the point for an honest difference of opinion among reasonable men. Sparks having observed that there were cattle at large by the side of the road, a jury could properly conclude that he should have slowed his truck in anticipation that there might be another one or more of them on the highway in the immediate vicinity. There is also a fair question as to whether he should have seen the last cow within the beam of his lights before he says he did. If the lights of the vehicle approaching from the opposite direction were so directed and focused that they would have "blinded" him, it seems likely that they would have illuminated the cow on the road. It is our conclusion that the facts and circumstances of the case warranted an instruction on contributory negligence. Cf. Massie v. Salmon, Ky., 277 S.W. 2d 49, 52 (1955).

The instruction of which complaint is made reads as follows:

"It was the duty of the plaintiff, William L. Sparks, at the time and place of the accident concerning which you have heard evidence to exercise ordinary care for his own safety in the operation of the motor vehicle which he was driving, and that duty included the following duties: To keep a lookout ahead for other traffic, including cattle on the highway and to exercise ordinary care to avoid colliding with same; to have his motor vehicle under reasonable control, and not to operate the same at a greater speed than forty (40) miles per hour, and to have the same equipped with two headlights showing white or tinted other than red, and of sufficient power to distinguish substantial objects for a distance of at least 350 feet ahead under ordinary atmospheric conditions on bright beam or 100 feet on low beam to which he was to dim at least 500 feet of oncoming traffic, and if you believe that the plaintiff violated any one or more of these duties, and that such violation, if any, so contributed to the cause of the accident and consequent

3. KRS 189.390(2) (b).

4. KRS 189.040.

injuries to plaintiff, that but for which the same would not have occurred, then the law for this case is for the defendant, even though you may also believe that defendant violated the duty imposed on her in instruction No. 1."

 The only direct evidence of speed was Sparks's own testimony that he was traveling at a rate of 38 to 40 m. p. h. Assuming, therefore, that there was no circumstantial evidence of substance to indicate a greater speed, an instruction on the point was unnecessary and technically improper. Cf. Willett v. Bradas & Gheens, Inc., 283 Ky. 525, 142 S.W.2d 139, 142 (1940). However, the enumeration of a driver's basic duties in a single instruction does not emphasize any one of them over the others and does not so invite speculation that we can justifiably find prejudice in the inclusion of a duty just because it is technically irrelevant.[5] From a practical standpoint, it seems to us that when there has been no evidence of excessive speed there is a greater likelihood of benefit than prejudice to the driver through the jury's being advised of the speed limit.

 With respect to that portion of the instruction dealing with lights, the objection is in substance that there was no basis for mention of the 350-foot power under ordinary conditions because at the time of the accident Sparks had deflected his lights as required by KRS 189.040(5), whereupon only a 100-foot reach was mandatory.[6] See KRS 189.040(3) (a) and (b). This phase of the instruction was substantially correct, and it seems very unlikely to us that the jury could have misunderstood it.

The judgment is affirmed.

5. Compare Baker v. Sizemore, Ky., 338 S.W.2d 386, 391 (1960).

6. At best, this theory ignores the significance of Sparks's having dimmed his lights when the distance between the two trucks was well over 500 feet. It is distinctly possible that his failure to discover the cow on the highway resulted from the dimming of his lights before it was reasonably necessary.